## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANDREW SWANK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | 2:13-cv-1185 |
| | ) | |
| v. | ) | Judge Mark R. Hornak |
| | ) | |
| WAL-MART STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### OPINION

**Mark R. Hornak, United States District Judge**

On June 1, 2015, Plaintiffs Andrew Swank, Sean McCracken, and James Paolicelli filed the operative complaint in this case, the Third Amended Individual and Collective/Class Action Complaint ("TAC"), against Defendant Wal-Mart Stores, Inc. ("Wal-Mart").[1] In the TAC, the Plaintiffs, all former Assistant Managers of Wal-Mart ("AMs"), allege that Wal-Mart violated the Fair Labor Standards Act ("FLSA") and the Pennsylvania Minimum Wage Act ("PMWA") by not paying overtime wages to its AMs. (TAC, ECF No. 59, at 1–2.) In essence, the Plaintiffs argue that they were managers in name only, and they allege that Wal-Mart relied on its AMs to perform the work of hourly associates without overtime pay as a cost-savings method. Pending before the Court is the Plaintiffs' Motion for Rule 23 Class Certification and 29 U.S.C. § 216(b) Conditional Certification, ECF No. 143. For the reasons that follow, the Plaintiffs' Motion is denied.

---

[1] For the purposes of pretrial proceedings, this action has been consolidated with *Paolicelli v. Wal-Mart Stores, Inc.*, No. 14-cv-267 (W.D. Pa.). (Order of Consolidation, ECF No. 56.)

# I.  BACKGROUND

Wal-Mart is a large corporation with its headquarters ("Home Office") in Bentonville, Arkansas. (Pls.' Mem. in Supp., ECF No. 144, at 12 ("ECF No. 144").) Because Wal-Mart has so many stores across the country, Wal-Mart divides the United States into six Divisions, each of which is composed of Regions. (*Id.*) Each Region has a Regional Manager who reports to the Home Office. (*Id.*) Each Region is composed of Markets, which are managed by the Market Managers, who report to the Regional Managers. (*Id.*) Individual stores are in turn managed by the Store Managers, who report to the Market Managers. (ECF No. 144, at 13; Def.'s Resp. in Opp'n, ECF No. 159, at 11 ("ECF No. 159").) The Store Managers manage the Co-Managers, of which there are typically two to four per store, and the Co-Managers manage the AMs. (ECF No. 144, at 13–14; ECF No. 159, at 11.) There are generally nine or ten AMs per store, but, depending on its specific characteristics, a store can have fewer or more than ten AMs. (ECF No. 144, at 13–14; ECF No. 159, at 4.) Each AM is responsible for a particular area or areas of the store. (ECF No. 159, at 12.) Below the AMs there are Department Managers, and until the spring of 2015, there were also Zone Merchandise Supervisors. (ECF No. 144, at 14.) Finally, each store has hourly associates. (*Id.*)

There are approximately 140 Wal-Mart stores in Pennsylvania. (ECF No. 144, at 12; ECF No. 159, at 11.) Some are smaller stores called Division 01 Discount Stores, while others are larger stores called Supercenters. (ECF No. 159, at 10–11.) Each of the Plaintiffs was formerly an AM at one or more Wal-Mart stores in Pennsylvania. (TAC, ECF No. 59, at 2.) According to Wal-Mart's "Job Description," the essential functions of AMs include tasks such as:

- "Provid[ing] supervision and development opportunities for hourly Associates in assigned area by hiring, training, mentoring, assigning duties, evaluating performance, providing recognition, and ensuring diversity awareness."

2

- "Ensur[ing] compliance with Company policies and procedures by holding hourly Associates accountable; analyzing and interpreting reports; implementing and monitoring asset protection and safety controls; maintaining quality assurance standards; overseeing safety and operational reviews; developing and implementing action plans to correct deficiencies; and providing direction and guidance on executing Company programs and strategic initiatives."

- "Model[ing], enforc[ing], and provid[ing] direction and guidance to hourly Associates on proper Customer service approaches and techniques to ensure Customer needs, complaints, and issues are successfully resolved within Company guidelines and standards."

(Pls.' App. of Confidential Evid. in Supp. of Mot., ECF No. 148-3, at 67 ("Pls.' App.").)

Under both the FLSA and the PMWA, employers must pay their employees overtime wages for any hours worked over forty in a given workweek, unless an exemption applies. 29 U.S.C. § 207(a)(1); 29 U.S.C. § 213; 43 Pa. Stat. § 333.104(c); 43 Pa. Stat. § 333.105. Wal-Mart admits that during the relevant time period it classified its AMs as "exempt employees who were not eligible to receive overtime pay [under the FLSA and the PMWA]." (Answer to TAC, ECF No. 61, at 5.) The Plaintiffs argue that they were incorrectly classified as exempt and that Wal-Mart's failure to give them overtime wages violated the FLSA and the PMWA. The federal and state exemption at issue in this case is the bona fide executive exemption, which exempts employees in certain executive, managerial, and other decision-making roles from overtime wage requirements under the FLSA and the PMWA. 29 U.S.C. § 213(a)(1); 43 Pa. Stat. § 333.105(a)(5).

Because both parties agree that the AMs earn more than $455 per week, to prove that the AMs are exempt as executives under the FLSA, Wal-Mart must show that: (1) the AMs' "primary duty is management of the enterprise in which [they are] employed or of a customarily recognized department or subdivision"; (2) the AMs "customarily and regularly direct[] the work of two or more other employees"; and (3) the AMs have "the authority to hire and fire other employees or [their] suggestions and recommendations as to the hiring, firing, advancement, promotion or any

3

other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(2)–(4).

Similarly, because it is undisputed that the AMs earn more than $250 per week, to prove that AMs are exempt as executives under the PMWA, Wal-Mart must demonstrate that the AMs' primary duty (1) "consists of the management of the enterprise in which [they are] employed or of a customarily recognized department or subdivision" and (2) "includes the customary and regular direction of the work of two or more other employees." 34 Pa. Code § 231.82(6).

Under both the PMWA and the FLSA,[2] "[t]he term 'primary duty' means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Some factors that the Court can consider to determine the primary duty of an employee include: (1) "the relative importance of the exempt duties as compared with other types of duties"; (2) "the amount of time spent performing exempt work"; (3) "the employee's relative freedom from direct supervision"; and (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

In this case, the Plaintiffs seek class certification under Rule 23 of the Federal Rules of Civil Procedure and conditional certification under the FLSA, 29 U.S.C. § 216(b). (Pls.' Mot. for Certification, ECF No. 143.) The Plaintiffs originally sought a class that included "[a]ll persons employed by Wal-Mart as Assistant Managers within the State of Pennsylvania from August 16, 2010, until the date of the Court's class certification order." (*Id.*) However, in their Reply brief, the Plaintiffs explain that they wish to narrow their proposed class to include only those AMs who

---

[2] Both parties agree that the phrase "primary duty" in the PMWA should be interpreted as defined for the purposes of the FLSA. (ECF No. 144, at 11 n.2; ECF No. 159, at 26.)

4

worked in Pennsylvania from August 16, 2010, through April 1, 2015, when Wal-Mart changed certain compensation and bonus policies. (Pls.' Reply Mem., ECF No. 187, at 6–7.) Wal-Mart opposes such class redefinition. Wal-Mart argues that the new class definition would be substantially prejudicial because Wal-Mart conducted extensive discovery in reliance on the Plaintiffs' initial class definition and did not have cause to question either side's witnesses about the April 2015 policy changes or defend against the Plaintiffs' new theory in any way. (Def.'s Sur-Reply Br., ECF No. 208, at 15–16.) Furthermore, Wal-Mart asserts that the Plaintiffs were aware of the policy changes before they moved for class certification and that the Plaintiffs have not cited any statements by any witnesses to support their theory that the duties of AMs changed in April 2015. (*Id.* at 18.) In fact, Wal-Mart argues that the 2015 policy changes did not affect the AMs' duties in any material way. (*Id.* at 19.)

The Court accepts the Plaintiffs' narrowed class definition for the purposes of deciding the pending Motion. The Court does so because its conclusion as to class certification will not change based on which class definition it uses—in either case, the Court cannot certify the class. In addition, the Court concludes that Wal-Mart is not substantially prejudiced by the Court's class definition decision. Under the Plaintiffs' narrowed class definition, Wal-Mart is exposed to *less* potential liability and damages, not more. Furthermore, given that, as Wal-Mart points out, the Plaintiffs have not cited any statements to demonstrate that the AMs' duties changed in April 2015, Wal-Mart is not substantially prejudiced by the fact that it did not know to question the witnesses about the policy change. Instead, the discovery that Wal-Mart has conducted continues to be relevant for the Plaintiffs' more narrow time period because, as Wal-Mart explained, "Wal-Mart gathered dozens of declarations from current and former [AMs] in Pennsylvania, and all but four of them worked as [AMs] or as [AMs] and co-managers before *and* after April 2015 . . . . *[N]ot*

5

***one of them*** limited his or her testimony to a period after April 2015 or suggested their primary duties changed at that time." (Def.'s Sur-Reply Br., ECF No. 208, at 20 (emphasis in original).) Accordingly, the Court will use the narrowed class of AMs who worked in Pennsylvania from August 16, 2010, through April 1, 2015, for the purposes of deciding the pending Motion. *See Wiesfeld v. Sun Chem. Corp.*, 84 F. App'x 257, 259 (3d Cir. 2004) (quoting *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) as stating that a court "is not bound by the class definition proposed in the complaint"), *aff'g* 210 F.R.D. 136, 138 (D.N.J. 2002) ("Despite the failure of Plaintiff to amend his complaint to reflect the proposed change in the class, this Court will use the modified class definition for purposes of this class certification motion . . . .").

## II.   **DISCUSSION**

Plaintiffs' Motion asks the Court to certify their proposed class under Rule 23 as well as to conditionally certify their proposed collective action under § 216(b). The Court will address each request in turn.

### A.   **Class Certification Under Rule 23**

In order for the Court to certify their proposed class under Federal Rule of Civil Procedure 23, the Plaintiffs must demonstrate by a preponderance of the evidence that the "four threshold requirements" delineated in Rule 23(a) are met: "(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 426 (3d Cir. 2016) (citing Fed. R. Civ. P. 23(a)). Because the Plaintiffs are seeking certification under Rule 23(b)(3), if the Court concludes that the Plaintiffs have satisfied the requirements of Rule 23(a), the Court must then "consider whether (1) common questions predominate over any questions affecting only individual class members (predominance) and (2) class resolution is superior to other available methods to decide the controversy (superiority)." *Id.*

6

*1. Rule 23(a)*

To satisfy the numerosity requirement under Rule 23(a)(1), a class must be "so numerous that joinder of all members is impracticable." *Id.* (quoting Fed. R. Civ. P. 23(a)(1)). In this case, Wal-Mart does not dispute that the numerosity requirement is met, so the Court need not expound upon the issue.

As for the commonality requirement under Rule 23(a)(2), the Third Circuit has explained:

"A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of . . . the prospective class." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013) (internal quotation marks omitted). "Their claims must depend upon a common contention . . . that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, [350] (2011). Meeting this requirement is easy enough: "[W]e have acknowledged commonality to be present even when not all members of the plaintiff class suffered an actual injury, when class members did not have identical claims, and, most dramatically, when some members' claims were arguably not even viable." [*In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 397 (3d Cir. 2015) (internal citations omitted).]

*Id.* at 426–27. Here, the Court concludes that there are numerous questions of fact and law common to the proposed class. Such questions include (among others) the AMs' position in the Wal-Mart job hierarchy and the formula that should be used to calculate the overtime rate, should the AMs ultimately be entitled to damages. Although counsel for Wal-Mart disputed that the Plaintiffs had met the commonality requirement under Rule 23(a) at oral argument (*see* Tr. of Proceedings on May 31, 2017, ECF No. 248, at 49–50), Wal-Mart did not address this issue in its briefs, and the Court concludes that Wal-Mart's arguments against commonality under Rule 23(a) are in reality arguments against predominance under Rule 23(b). Accordingly, given the low threshold for meeting the commonality requirement, the Court concludes that the Plaintiffs have met the commonality requirement in this case.

Additionally, Wal-Mart does not contest that the Plaintiffs' claims are "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). The Court agrees that the Plaintiffs' claims (that they were incorrectly classified as exempt employees) are typical of those of the class and therefore concludes that the typicality requirement has been satisfied.

Although Wal-Mart agrees that the first three requirements of Rule 23(a) have been met, it argues that the Plaintiffs cannot satisfy the fourth requirement: adequacy of representation. (ECF No. 159, at 40.) Wal-Mart asserts that Plaintiffs Swank and McCracken admitted that they had lied on their performance evaluations and in other ways and that such conduct bears on the Court's adequacy analysis. (*Id.* at 41.) As the Third Circuit has clarified, "Rule 23(a)(4) requires class representatives to 'fairly and adequately protect the interests of the class.' It tests the qualifications of class counsel and the class representatives. It also aims to root out conflicts of interest within the class to ensure that all class members are fairly represented in the negotiations." *In re Nat'l Football League*, 821 F.3d at 428 (quoting Fed. R. Civ. P. 23(a)(4)). Despite Wal-Mart's assertions to the contrary, the Court concludes that the Plaintiffs are qualified to represent the class; therefore, the adequacy requirement has been met. Regardless of whether the Plaintiffs were dishonest on their performance evaluations, Wal-Mart has not cited to any cases from the Third Circuit or this District that demonstrate that a plaintiff's dishonesty in such circumstances would make her an inadequate class representative. In addition, the Plaintiffs have secured qualified class counsel, and there are no conflicts of interest asserted by either side. Thus, the Court concludes that the Plaintiffs are adequate class representatives.

### 2. *Rule 23(b)(3)*

Because the Court has concluded that the Plaintiffs have satisfied the requirements of Rule 23(a), the Court must now consider whether the Plaintiffs have met the requirements of Rule

8

23(b)(3)—predominance and superiority. In this case, the parties' arguments focus on the predominance requirement.

For the Plaintiffs to satisfy the predominance requirement, this Court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The Supreme Court has explained that:

> An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotation marks omitted). In other words, the predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Taha v. Cty. of Bucks*, 862 F.3d 292, 308 (3d Cir. 2017) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). "To determine this level of cohesion, 'the predominance requirement focuses on whether essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence.'" *Id.* (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 359 (3d Cir. 2013)).

At its core, this case boils down to whether common questions predominate over individual questions in the determination of whether the AMs' primary duty is management. The Plaintiffs argue that common questions predominate because all four of the factors delineated in 29 C.F.R. § 541.700(a) that are used to assess primary duty (namely, (1) the relative importance of exempt/nonexempt duties; (2) the amount of time spent on exempt work; (3) the employee's relative freedom from supervision; and (4) the relationship between the salary of the employee and that of other employees performing the same nonexempt work) can be considered on a class-wide basis. More specifically, the Plaintiffs assert that (1) the relative importance of the AMs' nonexempt duties is a common question because it should be viewed from Wal-Mart's perspective;

9

(2) that the declarations made and the depositions conducted in this case illustrate that the AMs were all spending similar amounts of time on exempt/nonexempt work; (3) that all of the AMs were subject to the same high level of supervision (which can be at least partially ascertained by examining Wal-Mart's policies); and (4) that the relationship between the AMs' salary and the salary of other employees performing nonexempt work can be determined class-wide by conducting a survey of the total number of hours worked per week by the AMs.[3] (Pls.' Reply Mem., ECF No. 187, at 7–26.)

In contrast, Wal-Mart argues that individual questions predominate in this case. Wal-Mart contends that the declarations and deposition testimony collected demonstrate a vast disparity among the experiences of the Pennsylvania AMs and that such disparity means that the Court cannot determine the AMs' primary duty in a class-wide manner. Rather, Wal-Mart argues that the Court would have to make an individualized determination of each AM's primary duty in order to determine if the AM was properly classified as exempt. (ECF No. 159, at 26–40.)

After considering the extensive record in this case, the Court concludes that the predominance requirement is not met here because individual questions predominate over common questions. As agreed by both parties, when considering an employee's primary duty, "what matters is the reality of the job, not a lawyer-drafted job description." (Pls.' Reply Mem., ECF No. 187, at 14; *see also, e.g.*, ECF No. 159, at 29.) In examining the declarations submitted by both parties, it is clear that the actual experiences of the AMs vary significantly. For example, the Plaintiffs submitted a multitude of declarations from AMs who stated that they spent the majority of their time performing nonexempt work that hourly employees also performed. (*See, e.g.*, Pls.' Aff. Decl.

---

[3] The Court notes that the Plaintiffs have relied on reports by Dr. Richard Martell in making their arguments. However, as the Court discussed in its Order of September 14, 2017, ECF No. 253, the Court does not find Dr. Martell's reports to be useful in making its class certification decision.

1–25 of Compendium of Decls., ECF No. 144-9, at 9, ¶¶ 11, 12 ("ECF No. 144-9") ("My main duty while working as an [AM] at Wal-Mart was to perform the same tasks as the hourly workers. These tasks included: receiving and unloading trucks; sorting trucks; stocking shelves . . . . On a typical day I spent at least 75% of my time doing the same manual tasks as hourly Associates, Department Managers and [Zone Merchandise Supervisors]."); *id.* at 76, ¶ 13 ("On a typical day, I spent at least 80% of my time doing the same manual tasks as hourly associates, Department Managers and [Zone Merchandise Supervisors]. The other work I did, such as occasional interviews and evaluations, or running a weekly schedule using Wal-Mart's automated scheduling program was a minor part of my job . . . ."); *id.* at 137, 139, ¶¶ 14, 18 ("On a typical day, I spent at least 90% of my time doing the same manual tasks as hourly associates. . . . In the various hourly associate roles I held prior to working as an [AM]—including Deli Associate, Deli Manager, and Fresh Zone Manager—I performed essentially the same set of tasks that I performed as an [AM] . . . .").)

On the other hand, Wal-Mart has submitted many declarations from other AMs who explained that the majority of their time was spent on exempt work and that they did not perform the same duties as hourly employees. (*See e.g.*, Def.'s App. I, Exs. SS-01 to SS-10, ECF No. 159-6, at 28, ¶ 19 ("ECF No. 159-6") ("While my duties vary day by day, I would say that I perform management duties at least 99% of the time, and the other 1% is by my choice . . . . Virtually everything I do as an [AM] requires me to use my discretion; that is the only way to properly run my store."); *id.* at 33, ¶ 11 ("[T]he [AM] spends the majority of their time doing managerial functions, like planning, looking at staffing and scheduling, and following up with their associates to ensure the tasks assigned are completed. [AMs] have to figure out how to do these administrative tasks while associates are out there completing the assigned tasks."); Def.'s App. I, Exs. SS-11 to

11

SS-20, ECF No. 159-7, at 34, ¶ 14 ("ECF No. 159-7") ("Very rarely will I get on a register, but I have in the past when circumstances call for it. However, I am only on the register for 15 minutes at the most during those times, and certainly never for hours at a time. That is not my job as an [AM], to perform hourly tasks. I am evaluated on the competencies listed on my job description, which doesn't include stocking or ringing register. It does include skills like driving store experience and managing merchandising operations, which are the sorts of tasks that I spend the majority of my time on."); *id.* at 56–57, ¶ 9 ("The bulk of my day—about 70%—is spent touring, auditing, supervising to make sure the work is done correctly, training, and managing my department and my [Department Managers]. Occasionally, if there are call offs or I have scheduling issues, I'll do less of that and assist my [Department Managers] with completing their tasks. . . . Even on the days when I choose to step in and help my [Department Managers], it's never a big part of my day because as an [AM] if you can't give direction and delegate then you're not doing your job right.").)

In short, as the Court considers the record, the tasks and responsibilities of an AM can vary wildly depending on which witness is speaking. Without a common narrative in the record as to what the AMs actually did on a day-to-day basis, this Court cannot extrapolate the primary duty of all AMs in Pennsylvania on a class-wide basis. The Plaintiffs assert that Wal-Mart's declarations are "belied by the deposition testimony about what employees actually did." (Pls.' Reply Mem., ECF No. 187, at 25.) To put it plainly, the Court does not agree. Out of Wal-Mart's thirty-five (35) declarations from AMs,[4] the Plaintiffs have identified only two (2) instances where a witness's description of his or her work, which sounded managerial in the declaration, later sounded menial when described in that witness's deposition. (*See* Pls.' Reply Br., ECF No. 187, at 25 (e.g., "Martin

---

[4] *See* Def.'s App. I, Ex. SS, ECF No. 159-2, at 1–2.

Brandt's declaration states that one of his 'primary responsibilities' is 'making sure the customer service is there for the customers." . . . In deposition, he testified that this meant that he spends 'a very high percent of the time' assisting customers who ask him for assistance").) Similarly, the Plaintiffs assert that in four (4) other instances, a witness testified about spending time during their days on tasks that were not mentioned in their declarations. (*See* Pls.' Reply Br., ECF No. 187, at 22–24 (e.g., "In her deposition, Wal-Mart declarant Bonnie Hopkins, whose declaration is silent about Daily Notes, testified about receiving 36 Daily Notes in a day, and 'doing a lot of them' herself").) Even if the Court agreed that each of the Plaintiffs' six (6) identified examples were, in fact, inconsistencies that "belied" the witnesses' declarations (a conclusion the Court declines to make[5]), the Plaintiffs have not put forth nearly enough examples of contradictory statements for the Court to conclude that it should discredit these challenged declarations, or ignore the large number of remaining declarations demonstrating that the AMs' experiences varied greatly.[6]

Similarly, the declarants' accounts of the supervision they experienced, including with regard to hiring/firing and crafting performance reviews, were highly varied. Some of the

---

[5] The Court notes that at least one of the "inconsistencies" cited by the Plaintiffs (and quoted by the Court as an example above)—the declaration and deposition of Wal-Mart's witness Martin Brandt—appears significantly less inconsistent when read in context. The transcript of Mr. Brandt's deposition states:

Q. How much time every day do you spend helping customers?
    MS. BUNTING: Objection to the form.
    THE WITNESS: When my supervisors or my zone supervisor has a question for me that they are unclear about or if a customer is there and sees me directly, it's a very high percent of time of the day.
    I'm a manager who is on the sales floor. I'm always up front. I'm always observing, watching, being analytical about the business and the customers, reviewing their shopping carts, what's in it, the amount, what's in their shopping cart, how far did they walk down to a specific register before they turned around or try to turn around. I mean, there's a lot.

(Pls.' App. 1, Ex. 40, Brandt Dep., ECF No. 187-2, 63:1–16; *but see* Pls.' Reply Br., ECF No. 187, at 25.)

[6] For its part, Wal-Mart has also identified instances where it asserts that the Plaintiffs' declarations are undermined by the witnesses' deposition testimony. (ECF No. 159, at 21–22.)

13

declarants explained that they did not play a large role in hiring employees, that their performance reviews had to be approved by their higher-ups, and that they could not fire anyone. (*See, e.g.*, ECF No. 144-9, at 45, ¶ 21 ("I played no role in hiring [Zone Merchandise Supervisors] or Department Managers. I only had some input on hiring Associates and a Store Manager or Co-Manager always made the ultimate hiring decision."); Pls.' Aff. Decl. 26–47 of Compendium of Decls., ECF No. 144-10, at 146–47, ¶ 22 ("Wal-Mart required me to complete annual performance reviews for hourly associates below me, but this, too, consisted of filling out a standardized Wal-Mart form and giving simple ratings on a scale on the form. I would pass along my form to the Shift or Store Manager who had to approve the review and the ratings."); ECF No. 144-9, at 68, ¶ 22 ("In addition, I was not allowed to fire anyone.").)

However, other declarants explained that they had much more discretion regarding such matters. (*See e.g.*, ECF No. 159-6, at 12, ¶ 11 ("When I decide to hire, I get a requisition opened. . . . I don't have to get my store manager's permission to hire. My store manager trusts my judgment in determining when to hire and accepts my recommendations."); *id.* at 42, ¶ 18 ("Every [AM] is responsible for their own hiring. When I was in front end, I took on the bulk of the hiring for the store. . . . Generally, a store manager or co-manager will do a final interview to act a second pair of eyes before final hiring."); ECF No. 159-7, at 34, ¶ 13 ("I have the authority to conduct performance evaluations for all of my associates . . . . I am the ultimate decision maker as to what rating to give my associates. . . . . I certainly am not required to run my ratings by my Store Manager or Co-Manager before I provide them to the associate."); Def.'s App. I Exs. SS-30 to SS-35, ECF No. 159-9, at 4, ¶ 17 ("I'd estimate that over my time as an [AM], I've terminated about 85 hourlies. I do not need to consult with a store manager before doing so . . . ."); Def.'s 2d

Statement of Evid., ECF No. 208-2, at 23–25, 27–28 (summarizing deposition testimony by witnesses who stated they had authority and discretion in hiring and performance evaluations).)

The Court could go on. Ultimately, however, the Court's review of the record indicates that although the AMs' jobs were similar in some ways, the AMs had a wide array of individualized experiences that varied significantly in ways that bear materially on the analysis of their primary duties. Despite the Plaintiffs' arguments to the contrary, it is plain that different AMs spent their days performing vastly different tasks and working under varying levels of supervision. Accordingly, the Court concludes that individual questions predominate in this case and therefore the predominance requirement of Rule 23(b)(3) has not been met. The Plaintiffs' Motion for Class Certification under Rule 23 is denied.[7]

The Court would note that its decision is based on the record in front of it in this case. Both parties have helpfully cited to cases that are similar to this case, and the Court is aware that other district courts have addressed similar issues in a number of ways. *See, e.g.*, *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408 (S.D.N.Y. 2013), *on reconsideration in part*, 293 F.R.D. 578 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3 (2d Cir. 2015) (granting class certification under Rule 23 to Assistant Managers at Duane Reade); *Zackaria v. Wal-Mart Stores, Inc.*, No. 12-cv-1520, 2015 WL 2412103 (C.D. Cal. May 18, 2015) (denying class certification under Rule 23 to Asset Protection Coordinators at Wal-Mart). Although other cases are instructive, the Court has reviewed the specific record at issue here and concludes that class certification under Rule 23 must be denied.

---

[7] The Plaintiffs also request that the Court certify an issue class pursuant to Rule 23(c)(4) to determine liability, should the Court conclude that damages must be resolved on an individual basis. (ECF No. 144, at 45.) As discussed, the Court has concluded that liability cannot be determined on a class-wide basis, so the Plaintiffs' request for certification under Rule 23(c)(4) is denied.

## B. Conditional Certification Under 29 U.S.C. § 216(b)

The Court now turns to the Plaintiffs' Motion for Conditional Certification under 29 U.S.C. § 216(b).

### 1. Standard of Law

In the Third Circuit, courts typically follow a two-step process for deciding whether a suit brought under § 216(b) may properly proceed as a collective action. *See, e.g.*, *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013); *Zavala v. Wal-Mart Stores, Inc.*, 691 F.3d 527, 535 (2012); *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 192 (3d Cir. 2011), *rev'd on other grounds*, 569 U.S. 66 (2016). At the first step, known as conditional certification or the notice stage, "the court makes a preliminary determination as to whether the named plaintiffs have made a 'modest factual showing' that the employees identified in their complaint are 'similarly situated.'" *Camesi*, 729 F.3d at 243 (quoting *Zavala*, 691 F.3d at 535). If the plaintiffs satisfy this "fairly lenient standard," the court may "conditionally certify the collective action for the purpose of facilitating notice to potential opt-in plaintiffs and conducting pre-trial discovery." *Id.* (internal quotations omitted). The second step, known as final certification, occurs "[a]fter discovery, and with the benefit of 'a much thicker record than [the court] had at the notice stage.'" *Symczyk*, 656 F.3d at 193 (quoting *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008)). At the second stage, the court "makes a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff." *Id.* The burden is on the plaintiffs to establish that they satisfy the similarly situated requirement by a preponderance of the evidence. *Zavala*, 691 F.3d at 537. "This second stage is less lenient, and the plaintiff bears a heavier burden." *Symczyk*, 656 F.3d at 193 (quoting *Morgan*, 551 F.3d at 1261).

If the plaintiffs satisfy this heavier burden and the court concludes that the proposed collective plaintiffs are similarly situated, the case may proceed to trial as a collective action. *Id.*

Although the parties agree on the foregoing standard of law, they disagree on which stage of the certification analysis the Court should apply in this case. The Plaintiffs assert that this is a "step one," notice-stage case, because the Court has not yet conditionally certified the collective action. Accordingly, the Plaintiffs assert, they only need to satisfy the "modest factual showing test" by demonstrating "some evidence, beyond mere speculation, that [the employer's] alleged policy affected other employees"—an "extremely lenient" standard. (ECF No. 148, at 46 (quoting *Bishop v. AT&T Corp.*, 256 F.R.D. 503, 507 (W.D. Pa. 2009)).)

Meanwhile, Wal-Mart argues that because the parties have already conducted extensive discovery and the Plaintiffs have provided notice to a substantial number of the putative class members, the typical justifications for applying the lenient standard at the notice stage do not apply to this case. (ECF No. 159, at 23, 41–44.) Rather, Wal-Mart advocates "a more searching inquiry," which has been applied at this stage of a certification analysis by some courts in other Circuits, to determine whether the proposed collective plaintiffs are in fact similarly situated. (ECF No. 159, at 23, 41–44); *see also Walker v. Jefferson Cty. Bd. of Educ.*, No. 13-cv-524, 2016 WL 1117643, at \*4 (N.D. Ala. Mar. 22, 2016); *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870 (N.D. Iowa 2008); *Smith v. T-Mobile USA, Inc.*, No. 05-cv-5274, 2007 WL 2385131, \*4 (C.D. Cal. Aug. 15, 2007) ("Where substantial discovery has been completed, some Courts have skipped the first-step analysis and proceeded directly to the second step."). In other words, according to Wal-Mart, this is a "step two," final certification case. (*Id.* at 42.)

Our Court of Appeals has made clear that District Courts retain broad discretion in determining whether to conditionally certify a collective action. *See, e.g.*, *Symczyk*, 656 F.3d at

17

193 n.5. To this end, it is helpful to reflect on the purposes for this two-tiered approach for certification. At the notice stage, the standard for plaintiffs to meet is "quite lenient" because, in the usual case, the parties have not yet conducted discovery. *See, e.g.*, *id.* at 192 (stating that the purpose of conditional certification is to facilitate notice and pretrial discovery). After the notices are sent, the parties typically engage in extensive discovery to determine whether the proposed collective plaintiffs are in fact similarly situated to the named plaintiff(s). *Id.* at 193. Thus, the standard at the notice stage is lenient precisely because, in the usual case, the record is not yet sufficiently developed to hold the plaintiffs to the more difficult standard they ultimately must satisfy to proceed as a collective action.

But this is not the usual case. This litigation has been pending for nearly five years, and the voluminous record before the Court has the benefit of extensive discovery targeted at whether the proposed plaintiffs are similarly situated. The operative pleading is the Plaintiffs' Third Amended Complaint, both parties have deposed multiple witnesses and conducted multiple rounds of written discovery, and (perhaps most importantly) the Plaintiffs have already contacted well over one thousand current or former AMs and received a significant number of consent-to-join forms. This is not a case where the Court needs to facilitate notice before the parties can identify the proposed plaintiffs and begin targeted discovery of their claims—that has already been done. Although discovery has not formally closed, counsel for the Plaintiffs stated at oral argument that the discovery remaining to be completed deals with compensation information, rather than the extent to which the proposed plaintiffs are similarly situated. (Tr. of Proceedings on May 31, 2017, ECF No. 248, at 91–92.) In short, if the Court were to view this as a notice-stage case for the purposes of the present Motion, the record would not change in any material way (if it changed at all) before the Court would be asked to apply the final certification analysis.

This "wash, rinse, repeat" routine would undermine the ultimate goals of a collective action: promoting judicial efficiency and serving the interests of justice. During oral argument, counsel for the Plaintiffs argued that the Court should apply the notice-stage, conditional certification standard because the discovery that had been conducted was for the class certification analysis under Rule 23, not the collective action under § 216(b), and the Plaintiffs could have made their § 216(b) Motion with substantially less evidence. (Tr. of Proceedings on May 31, 2017, ECF No. 248, at 75–76.) The Plaintiffs are certainly correct that they could have asserted this Motion at an earlier stage of the case with a much smaller evidentiary record, and had they chosen to do so, this case might have been a better fit for the typically lenient standard of conditional certification. However, by submitting a combined Motion for both Rule 23 and § 216(b) certification, the Plaintiffs in effect told the Court that the current evidentiary record was developed enough to meet each factor of Rule 23's certification analysis—an inquiry that is similar in many material respects to § 216(b)'s final certification burden. It makes little sense to disregard this voluminous record in considering the § 216(b) certification component of the Plaintiffs' Motion.

On the other hand, the Plaintiffs are correct that this Court has not yet granted conditional certification to the proposed collective action, and the period for plaintiffs to opt in remains open. This makes it difficult for the Court to "make[] a conclusive determination as to whether *each plaintiff who has opted in* to the collective action is in fact similarly situated to the named plaintiff[s]," *Symczyk*, 656 F.3d at 193 (emphasis added), and Wal-Mart has not identified any case from this Circuit where a court skipped directly to the second stage of the analysis.

The unusual procedural posture of this case—which the Court concludes does not fit neatly into either step of the typical FLSA analysis—is similar to the case confronted by the District Court for the Northern District of Alabama in *Walker v. Jefferson County Board of Education.*

19

Here, as in *Walker*, "this litigation has progressed well beyond the point that courts usually entertain an early motion for notice." 2016 WL 1117643, at *4. Ultimately, the *Walker* court concluded that "[w]hen, as here, an FLSA case is in an advanced posture that is 'different . . . than that envisioned . . . as the first stage, or 'notice stage,' . . . a more searching standard of review is appropriate." *Id.* (citing *Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004)). Under this "more searching standard," a plaintiff "will not be permitted to rely on the allegations in [the] Complaint. Rather, [a plaintiff] must rely on the evidence, and all the evidence will be considered, not just [plaintiffs' evidence]" in determining whether the proposed collective plaintiffs are similarly situated to justify facilitating notice. *Id.* (citing *Pickering v. Lorillard Tobacco Co.*, No. 10-cv-633, 2012 WL 314691, at *9 (M.D. Ala. Jan. 30, 2012)).

Although the Court declines Wal-Mart's invitation to subject this case to a full-fledged final certification analysis, it finds the reasoning set forth by the *Walker* court persuasive. Therefore, in light of the extensive discovery that has been already conducted in this case, the Court will apply the "more searching standard"—that is, the Court will approach the conditional certification question with an eye toward final certification, and will consider all of the evidence to determine whether the proposed collective plaintiffs are sufficiently similarly situated to justify facilitating notice and proceeding to the final certification analysis.

### 2. *Analysis*

Based on all of the evidence in the record, this Court finds and concludes that the Plaintiffs have not met this standard. To determine whether proposed collective plaintiffs are similarly situated, courts apply an "ad-hoc approach, which considers all the relevant factors and makes a factual determination on a case-by-case basis." *Zavala*, 691 F.3d at 536. The Third Circuit has stated:

> Relevant factors include (but are not limited to): whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment. Plaintiffs may also be found dissimilar based on the existence of individualized defenses.

*Id.* at 536–37.

As the Court discussed above, the substantial weight and scope of the evidence in the record demonstrates that the proposed collective plaintiffs have materially different circumstances of employment, particularly regarding their decision-making authority, level of supervision, and daily tasks, which require individualized liability determinations.[8] These differences preclude a finding that the proposed collective plaintiffs are similarly situated. Given the vastly different evidence in the record of what the AMs actually did on a day-to-day basis, "[t]o find otherwise would reduce Section 216(b)'s requirement that plaintiffs be 'similarly situated' to a mere requirement that plaintiffs share an employer, a job title, and a professed entitlement to additional wages." *Scott v. Chipotle Mexican Grill, Inc.*, No. 12-cv-8333, 2017 WL 1287512, at *9 (S.D.N.Y. Mar. 29, 2017) (quoting *Ruiz v. Citibank, N.A.*, 93 F.Supp.3d 279, 300 (S.D.N.Y. 2015)).

To be sure, the Plaintiffs have shown that the proposed plaintiffs are similar in certain ways: they are all AMs employed by Wal-Mart in Pennsylvania, for instance, and the Plaintiffs' evidence with regard to Wal-Mart's employment manual, job description, and other employment policies provides some common links among the proposed collective plaintiffs. But the proposed plaintiffs' common status as AMs is not enough under the more searching standard to establish

---

[8] *See supra* pp. 9–15. The Court notes that the similarly situated analysis under § 216(b) employs a different standard than the predominance requirement under Rule 23. Indeed, courts have held that the similarly situated analysis is "considerably less stringent than the requirement of Rule 23(b)(3) that common questions predominate." *Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 630–31 (S.D. Ca. 2014) (quoting *Troy v. Kehe Food Distribs., Inc.*, 276 F.R.D. 642, 649 (W.D. Wash. 2011)). However, the Court's factual review of the record conducted above with regards to the predominance requirement—in particular, the evidence showing the substantially disparate factual and employment circumstances of a wide swath of the individual AMs—is equally relevant to the Court's similarly situated analysis here.

that the plaintiffs are sufficiently similarly situated to justify facilitating notice and proceeding to the final certification analysis. The AMs' individualized experiences, as contained in the record before the Court, vary significantly in precisely the ways that bear on the Court's eventual determination of liability and damages. Accordingly, facilitating notice at this stage of the case, in light of the very extensive record that the parties have already developed which strongly demonstrates that the proposed collective plaintiffs are not, in fact, similarly situated, is both unnecessary and inappropriate. The Plaintiffs' Motion for Conditional Certification under § 216(b) is denied.

## III.  **CONCLUSION**

For the reasons stated in this Opinion, the Plaintiffs' Motion for Rule 23 Class Certification and 29 U.S.C. § 216(b) Conditional Certification, ECF No. 143, is denied.[9] An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: June 5, 2018

cc:  All counsel of record

---

[9] Also pending before the Court is the Defendant's Motion to Strike Certain of Plaintiffs' Errata Sheets, ECF No. 188. Although it appears to the Court that in some instances the Plaintiffs' changes to its deponents' testimony may extend past the reach of Rule 30(e), even if the Court were to consider all of the Plaintiffs' errata, it would not change the basis of the Court's decision to deny the Plaintiffs' Motion for Certification because the evidence in the record would still require the Court to determine each AM's primary duty on an individual basis, and those individualized issues and resolutions plainly predominate. Accordingly, the Defendant's Motion to Strike, ECF No. 188, is denied without prejudice as moot.

22